UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Ryan Wilson,                                        File No. 25-cv-1067 (ECT/DTS)

    Plaintiff,

v.                                                  **OPINION AND ORDER**

Get It Now, LLC,

    Defendant.

---

Blaine L.M. Balow, Evelyn Doran, and Maria Victoria Olszewska, HKM Employment Attorneys, Minneapolis, MN, for Plaintiff Ryan Wilson.

Robert F. Friedman, Littler Mendelson P.C., Dallas, TX, and Jacqueline A. Mrachek and Taylor R. McKenney, Littler Mendelson P.C., Minneapolis, MN, for Defendant Get It Now, LLC.

---

    Plaintiff Ryan Wilson was a district manager for Defendant Get It Now, LLC. Get It Now "operates stores that sell or lease household goods and appliances in Wisconsin under the name Get It Now and in Minnesota under the name Home Choice." ECF No. 8 ¶ 4. In this diversity case removed from Ramsey County District Court,[1] Mr. Wilson

---

[1] There is subject-matter jurisdiction over this case. In its Notice of Removal, Get It Now alleged that Mr. Wilson is a Minnesota citizen and that it is a citizen of Texas because its members are citizens of that state. ECF No. 1-2 ¶¶ 3–6; *see Cypress Creek Renewables Dev., LLC v. SunShare, LLC*, No. 18-cv-2756 (PJS/DTS), 2018 WL 5294571, at *1 (D. Minn. Oct. 24, 2018) ("[T]o plausibly allege the existence of diversity jurisdiction in a case involving an LLC, a notice of removal must identify all of the members of the LLC and, as to each such member, its citizenship."). And Get It Now alleged facts in the Notice of Removal plausibly showing that "the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00," a point Mr. Wilson does not dispute. ECF No. 1-2 ¶ 7; 28 U.S.C. § 1332(a).

alleges that Get It Now ended his employment because he reported the company's illegal activities to higher-ups and because he sought workers' compensation benefits. He asserts claims under the Minnesota Whistleblower Act and the retaliatory-discharge provision of the Minnesota Workers' Compensation Act.

Get It Now has moved to compel arbitration of Mr. Wilson's claims under the Federal Arbitration Act (or "FAA"). Mr. Wilson acknowledges signing an FAA-governed arbitration agreement.[2] He argues his claims cannot be arbitrated because he is subject to the FAA's "transportation worker" exemption. Get It Now's motion will be granted, and this case will be stayed pending the arbitration's completion. Construing the factual record in a light most favorable to Mr. Wilson, he has not carried his burden to show that the

---

[2] The arbitration agreement Mr. Wilson most recently signed reads in relevant part as follows:

> The Company and I mutually consent to the resolution by arbitration of all claims or controversies ("claims"), past, present, or future, including without limitation, claims arising out of or related to my application for employment, assignment/employment, and/or the termination of my assignment/employment that the Company may have against me or that I may have against any of the following: (1) the Company, (2) its officers, directors, employees, or agents in their capacity as such or otherwise, (3) the Company's parent, subsidiary, and affiliated entities, (4) the benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates, and agents, and/or (5) all successors and assigns of any of them.

ECF No. 8-1 at 2. The agreement also delegated to the arbitrator "exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Id*. at 4.

interstate movement of goods was a central part of the job description of the class of workers to which he belonged.

Once sued in federal court, a party to an arbitration agreement may move to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement" with respect to "any issue referable to arbitration under [the] agreement." 9 U.S.C. § 3.  Or a party to an arbitration agreement "may petition" a district court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.  Federal courts refer generally to a motion or petition under either § 3 or § 4 as a "motion to compel" arbitration.  *See, e.g.*, *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 254 (2009); *Triplet v. Menard, Inc.*, 42 F.4th 868, 870 (8th Cir. 2022).  A motion to compel arbitration is analyzed either as a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6) or as a motion for summary judgment under Rule 56, depending on how the motion is presented.  *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018); *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017).  Here, because "matters outside the pleadings" have been presented and considered, the motion "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); *see also City of Benkelman*, 867 F.3d at 882.

Under the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  The Supreme Court's "cases place it beyond dispute that the FAA was designed to promote arbitration.  They have repeatedly described the [FAA] as 'embod[ying] [a] national policy

3

favoring arbitration.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46 (2011) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).

Section 1 exempts from the FAA employment contracts of three categories of workers: (1) "seamen," (2) "railroad employees" and (3) "any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Supreme Court has construed Section 1 to "exempt[] from the FAA only contracts of employment of transportation workers," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001), but "[a] transportation worker need not work in the transportation industry to fall within the exemption," *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 256 (2024). The § 1 transportation-worker exemption is "narrow." *Circuit City*, 532 U.S. at 118 (explaining that the "§ 1 exclusion provision [is] afforded a narrow construction"); *see Bissonnette*, 601 U.S. at 256 (explaining that § 1 has a "narrow" scope).

The exemption's proponent bears the burden of showing the exemption applies. *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020) (Barrett, J.) ("To show that they fall within this exception, the plaintiffs had to demonstrate that the interstate movement of goods is a central part of the job description of the class of workers to which they belong."); *Joyner v. Frontier Airlines, Inc.*, No. 1:24-cv-001672-SKC-TPO, 2025 WL 1503141, at *1 (D. Colo. May 19, 2025) ("Plaintiffs, as the parties opposing arbitration, bear the burden of demonstrating they fall within an exemption under the FAA." (citing *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987)), *appeal filed*, 25-1211 (10th Cir. May 27, 2025); *Jennings v. Ed Napleton Elmhurst Imps. Inc.*, No. 1:23-cv-14099, 2025

4

WL 461433, at *4 (N.D. Ill. Feb. 11, 2025) ("As the party opposing arbitration, Jennings bears the burden of establishing that the transportation-worker exemption applies." (citation modified)); *Shanley v. Tracy Logistics LLC*, No. 2:24-cv-01011-DC-JDP, 2025 WL 19012, at *4 (E.D. Cal. Jan. 2, 2025) ("The party resisting arbitration under [the § 1] exemption bears the burden of proving that the exemption applies.'" (citation modified)); *Gray v. Schmidt Baking Co.*, No. 22-cv-00463-LKG, 2023 WL 9285466, at *3 (D. Md. Oct. 16, 2023) (same); *Bean v. ES Partners, Inc.*, 533 F. Supp. 3d 1226, 1230 (S.D. Fla. 2021) (same); *Curry v. P&S Transp., LLC*, No. 3:23-cv-00017-SHL-SBJ, 2023 WL 12088865, at *2 n.5 (S.D. Iowa May 23, 2023) (collecting cases); *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.").

Two questions are answered to determine whether a plaintiff qualifies as a "transportation worker" under § 1. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). First, the court "define[s] the relevant 'class of workers' to which [the plaintiff] belongs." *Id.* Second, the court "determine[s] whether that class of workers is 'engaged in foreign or interstate commerce.'" *Id.*

Several rules guide the first question's determination. The class of workers is "based on what [an individual] does at [the company], not what [the company] does generally." *Id.* at 456; *see also Bissonnette*, 601 U.S. at 255 ("[C]lasses of workers . . . are connected by what they do, not for whom they do it."). Courts emphasize that "in determining whether the exemption applies, the question is 'not whether the *individual worker* actually engaged in interstate commerce, but whether *the class of workers to which*

5

*the complaining worker belonged* engaged in interstate commerce.'" *Wallace*, 970 F.3d at 800 (quoting *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988)).

Mr. Wilson did not address or answer this first question in his opposition brief. *See generally* ECF No. 13. At the hearing on Get It Now's motion, Mr. Wilson asserted only that the class of workers to which he belonged was "transportation workers." In this context, repeating the exemption's title is unhelpful. Considering it was his burden to show the transportation-worker exemption applied, the failure to meaningfully address the class-of-workers question seems reason enough to rule against Mr. Wilson. Regardless, on this first question, the record evidence is sufficient to deduce an answer.

Mr. Wilson was a district manager overseeing several household-goods retail store locations, and the only reasonable answer on this record is that he belonged to that same class of workers—that is, a class of workers who manage or oversee multiple household-goods retail store locations within a defined geographic territory. Mr. Wilson testified in a declaration that he served as a district manager overseeing several store locations in Minnesota. ECF No. 15 ¶ 1 ("I served as a District Manager overseeing several store locations, primarily Store #1702 in St. Paul store [sic], #2972 in Maplewood, as well as locations in, [sic] Cottage Grove, Mankato, [and] Burnsville . . . ."). Get It Now said the same thing. In a declaration, its Senior Vice President of Retail Operations, Niels Boensch, testified that "Mr. Wilson was a District Manager who managed . . . retail store operations in Minnesota." ECF No. 19 ¶ 4. Mr. Wilson described typical territorial store-management duties in his declaration. These included, for example, managing employees, making staffing decisions, managing a vehicle fleet, controlling expenses,

6

managing marketing campaigns, and meeting with other district managers. ECF No. 15 ¶¶ 3–9. Get It Now said something similar. Mr. Boensch testified that the essential functions of the district-manager position were described in the following excerpt from Get It Now's district-manager job description:

| Sales/ Account Management: | 1. Achieve planned results for sales as set by the company through flawless execution of the company's sales programs<br>2. Achieve planned gross profit for district<br>3. Provide leadership, monitoring, and training required to ensure stores comply with established procedures and practices for collections<br>4. Achieve credit and collection targets as set by the company using the Account Management Observation and Coaching Guides |
|---|---|
| Leadership: | 1. Ensure timely and effective execution and compliance of all company programs, policies, and processes<br>2. Ensure timely and quality staffing of stores through approved employment practices, compliance with company policies and legal requirements, and support of the company's commitment to maintain a diverse workforce<br>3. Ensure effective training and development for all Store Managers and Coworkers in the district. Maintain individual development records to monitor Coworkers' performance and the number and quality of promotable Coworkers in the district<br>4. Maximize retention of Store Managers and all district Coworkers; demonstrate continual improvement in reducing turnover and Coworker complaints by establishing and maintaining a positive and productive work environment<br>5. Demonstrate through example, a commitment to exceptional customer service.<br>6. Provide leadership and management to ensure all stores' merchandising, cleanliness, and overall appearance comply with company programs and present the best possible appearance to the customer<br>7. Protect company assets through flawless execution of audits, inventory control, and expense management. |

ECF No. 19 ¶ 4. The parties' descriptions of Mr. Wilson's job classification may emphasize different aspects of Mr. Wilson's work duties, but regarding the broader worker class to which Mr. Wilson belonged, they do not disagree. The best answer on this record

is that Mr. Wilson belonged to a class of workers who manage or oversee multiple household-goods retail store locations within a defined geographic territory.[3]

Several rules guide the analysis of whether this class of workers is engaged in foreign or interstate commerce. The class must "play a direct and 'necessary role in the free flow of goods' across borders" or be "actively 'engaged in transportation' of [] goods across borders via the channels of foreign or interstate commerce." *Saxon*, 596 U.S. at 458 (quoting *Circuit City*, 532 U.S. at 119, 121); *Bissonnette*, 601 U.S. at 256 (same). A class of workers need not cross state lines to be covered, *see Saxon*, 596 U.S. at 456, and the class need not work for employers who operate in the transportation industry, *Bissonnette*, 601 U.S. at 256. The question is "whether the interstate movement of goods is a central part of the class members' job description." *Wallace*, 970 F.3d at 801. A class of workers does not qualify for the exemption just because its members "occasionally" participate in the interstate movement of goods. *Wallace*, 970 F.3d at 800 (citing *Hill v. Rent-A-Center*, 398 F.3d 1286, 1289–90 (11th Cir. 2005)).

---

[3] The cases do not provide explicit guidance regarding the level of generality or specificity at which a class of workers must be defined. To be clear, I think it makes the best sense to define the class of workers in this case to include the nature of the retail stores' business (here, household goods), but not to define the class specifically by reference to the employer (here, Get It Now). Regarding the former, it is not difficult to imagine how the job duties of a regional-retail-stores manager might change significantly depending on the nature or volume of products the retail stores sell. Compare, for instance, a regional manager of large department stores across several states with a regional manager of smaller drugstores in a metropolitan area. In any event, it is difficult to see how defining the worker class here more broadly might help Mr. Wilson. Regarding the latter, in *Saxon*, the Supreme Court did not define the class by reference to the employer, and I think that's as good an indication as any not to do that here. *Saxon*, 596 U.S. at 456 (defining "a class of workers who physically load and unload cargo on and off airplanes on a frequent basis" without incorporating their employer, Southwest Airlines).

*Saxon* is a helpful example of how these rules should be applied. There, the Supreme Court held that a class of workers—airline ramp supervisors—who "load[] or unload[] cargo on and off airplanes bound for a different State or country [were] 'engaged in foreign or interstate commerce'" and thus fell within the transportation-worker exemption. *Saxon*, 596 U.S. at 459. In reaching this conclusion, the Supreme Court repeatedly emphasized the frequency with which the cargo-loader class of workers engaged in foreign or interstate commerce-directed work. It described how Saxon's "work *frequently* requires her to load and unload baggage, airmail, and commercial cargo on and off airplanes that travel across the country." *Id.* at 453; *see also id.* at 454 ("*Frequently*, ramp supervisors step in to load and unload cargo alongside ramp agents."), 455 (noting "Saxon's 'uncontroverted declaration' that ramp supervisors '*frequently*' load and unload cargo"), 456 ("Southwest has not meaningfully contested that ramp supervisors like Saxon *frequently* load and unload cargo . . . .") (emphases added). And the Supreme Court concluded that these frequent activities concerned the "'transportation' of . . . goods across borders via the channels of foreign or interstate commerce." *Id.* at 458 (quoting *Circuit City*, 532 U.S. at 121). The Court explained:

> Cargo loaders exhibit this central feature of a transportation worker. As stated above, one who loads cargo on a plane bound for interstate transit is intimately involved with the commerce (*e.g.*, transportation) of that cargo. "[T]here could be no doubt that [interstate] transportation [is] still in progress," and that a worker is engaged in that transportation, when she is "doing the work of unloading" or loading cargo from a vehicle carrying goods in interstate transit.

*Id*. at 458–59 (quoting *Erie R.R. Co. v. Shuart*, 250 U.S. 465, 468 (1919)).

For a fundamental reason, Mr. Wilson has not carried his burden to show that the class of workers to which he belongs—those who manage or oversee multiple household-goods retail store locations within a defined geographic territory—is engaged in foreign or interstate commerce. Mr. Wilson did not address this question from the perspective of the class of workers to which he belonged; he addressed it from his perspective as a Get It Now employee. The evidence Mr. Wilson submitted in opposition to Get It Now's motion consists of just his declaration. And in his declaration, Mr. Wilson described just his duties with Get It Now. *See* ECF No. 15 ¶¶ 2–10. Mr. Wilson did not introduce evidence showing or describing the (or any) class of workers' job description more broadly. *Id.* Nor did he introduce evidence suggesting that his job duties with Get It Now accurately reflected the class's job description in material respects. *Id.* The same is true of Mr. Wilson's advocacy. In his opposition brief, Mr. Wilson argued that the transportation-worker exemption applied based only on Mr. Wilson's job duties. ECF No. 13 at 7.[4] As with the lack of an answer to the first question, Mr. Wilson ignored the governing framework. But unlike the first question (identifying the class of workers to which Mr. Wilson belonged), it is not possible on this record to identify that class's job description or central duties, meaning it is not possible to determine whether workers in the class engaged in foreign or interstate commerce for purposes of the

---

[4] Consistent with this approach, in pre-motion communications through which the parties shared their respective positions regarding the transportation-worker exemption, Mr. Wilson argued that the exemption applied based only on his job duties with Get It Now. *See* ECF No. 14.

transportation-worker exemption. For this reason, I cannot find that the transportation-worker exemption applies here.

If Mr. Wilson's evidence of his Get It Now job duties was probative of the class's job description, it could not reasonably be construed to show that the class engaged in foreign or interstate commerce. In his declaration, Mr. Wilson testified that his "daily duties involved extensive interstate commerce activities," ECF No. 15 ¶ 2, but the specific testimony offered to support this general statement leaves important questions unanswered and does not show that Mr. Wilson engaged in interstate commerce in the sense the transportation-worker exemption requires. Mr. Wilson's declaration testimony generally concerned the extent to which the stores and employees he managed marketed, sold, and delivered goods to Wisconsin residents. He testified, for example, that his Get It Now duties included "regularly selling, transporting, and delivering merchandise across state lines into Wisconsin." *Id.* Though Mr. Wilson did not say in that paragraph whether he oversaw these activities or performed them personally, in the next paragraph he testified that these activities were performed by employees he supervised and that he "directly coordinated, scheduled, and approved these interstate transactions as part of [his] core managerial responsibilities." *Id.* ¶ 3. Mr. Wilson also testified that he managed an interstate-delivery "fleet," *id.* ¶ 4, that he "personally crossed state lines multiple times," *id.* ¶ 6, and that he "participated in quarterly meetings with other District Managers that took place in Wisconsin," *id.* ¶ 7.

This testimony is insufficient in important respects. It provides no specific information demonstrating the centrality of these duties to Mr. Wilson's district-manager

11

position. This is especially problematic because Mr. Wilson did not dispute the accuracy of the job description introduced by Get It Now, and the high-level responsibilities listed in that document include no mention of the interstate movement of goods. *See* ECF No. 19 ¶ 4. It is difficult to understand how the fact that the stores Mr. Wilson managed sold goods to Wisconsin residents might show that the transportation-worker exemption applies. The record does not show that Mr. Wilson's central duties changed based on the interstate character of some unidentified portion of the stores' transactions. If Mr. Wilson's testimony were enough, it would be difficult to distinguish countless other retail workers who oversee or participate in the interstate sale of goods. That result would seem at odds with the Supreme Court's characterization of the exemption as "narrow." *Circuit City*, 532 U.S. at 118. And several of the activities Mr. Wilson described—like his participation in merchandise deliveries, repossessions, investigations, and quarterly meetings—are plainly occasional, *Wallace*, 970 F.3d at 800, meaning they do not contribute to demonstrating that the transportation-worker exemption applies. The bottom line is that Mr. Wilson's testimony cannot reasonably be construed to show that he—or, more accurately, the class of workers to which he belonged—was "active[ly] engage[d] in the enterprise of moving goods across interstate lines." *Wallace*, 970 F.3d at 802.

For some time, the Eighth Circuit has applied a "non-exclusive list of factors in determining whether an employee is so closely related to interstate commerce that he or she fits within the § 1 exemption of the FAA." *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348,

352 (8th Cir. 2005).  If this list remains good law or useful after *Bissonnette* and *Saxon*,[5] Mr. Wilson has not shown that he meets it.  (1) He did not "work[] in the transportation industry."  *Lenz*, 431 F.3d at 352.  (2) If Mr. Wilson was "directly responsible for transporting the goods in interstate commerce," he has shown only that this was an occasional duty, not one that was central to his job description.  *Id.*  (3) The same analysis applies to "whether [Mr. Wilson] handle[d] goods that travel interstate."  *Id.*  At most, this was an occasional happening, not part of his core responsibilities.  (4) Though Mr. Wilson testified that he supervised employees who delivered products in Wisconsin and managed a delivery-vehicle "fleet," ECF No. 15 ¶¶ 3–4, this testimony is not sufficiently specific to show that Mr. Wilson "supervise[d] employees who [were] themselves transportation workers, such as truck drivers," *Lenz*, 431 F.3d at 352.  (5) "[Un]like seamen or railroad employees," Mr. Wilson was not "within a class of employees for which special arbitration already existed when Congress enacted the FAA."  *Id.*  (6) It is difficult to understand how "a strike by [Mr. Wilson] would disrupt interstate commerce."  *Id.*  (7) Finally, Mr. Wilson did not testify regarding his vehicle use specifically, meaning the record does not establish that a "nexus" existed between his job duties and any vehicle he may have used to carry out those duties.  *Id.*[6]

---

[5]  *See Energy Transfer LP v. Moock*, --- S.W.3d ---, 2025 WL 1559841, at *9 (Tex. App. June 3, 2025) (concluding that *Bissonnette* and *Saxon* provide the framework and are not consistent with *Lenz*).

[6]  The Eighth Circuit's non-exclusive list includes an eighth factor—"whether the vehicle itself is vital to the commercial enterprise of the employer."  *Lenz*, 431 F.3d at 352.  Mr. Wilson mentioned a delivery fleet in his declaration, ECF No. 15 ¶ 4, but the

Mr. Wilson cited several cases for the proposition that the transportation-worker exemption applies to workers who do not themselves cross borders, transport goods, or have other interstate activities as their primary duties. *See* ECF No. 13 at 6–7 (first citing *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 22 (1st Cir. 2020) (holding that last-mile delivery driver for Amazon falls within § 1 exemption); then citing *Wolford v. United Coal Co.*, 764 F. Supp. 3d 329, 336–341 (W.D. Va. 2025) (holding that coal mine workers who do not transport coal across borders do *not* fall within exemption); and then citing *Islam v. Lyft, Inc.*, 524 F. Supp. 3d 338, 351–52 (S.D.N.Y. 2021) (holding that Uber and Lyft drivers fall within § 1 exemption despite that only 2–3% of rides cross state lines, considering that "[r]idesharing platforms provide hundreds of millions of rides in the United States each year," and 2–3% of these would "add[] up to tens of millions of interstate rides in the United States each year")). These cases seem to apply the rule that "a member of the class qualifies for the transportation-worker exemption even if she does not personally engage in interstate commerce." *Wallace*, 970 F.3d at 800 (quotation omitted). Regardless, answering whether a class of workers falls within the exemption requires a fact-intensive inquiry that carefully considers the class's central job duties, among other things. For that fundamental reason, it is difficult to see how cases involving Amazon "last-mile" delivery drivers, coal workers, and ride-share-service drivers might be analogous to a case involving a class of workers comprising regional retail-store managers.

---

declaration included no testimony regarding whether, or the extent to which, Get It Now's use of a vehicle or vehicles was "vital" to its "commercial enterprise."

Because Get It Now's motion to compel arbitration will be granted, the action will be stayed pending the arbitration's resolution. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendant Get It Now, LLC's Motion to Compel Arbitration [ECF No. 4] is **GRANTED**.

2. This action is **STAYED** pending the arbitration's resolution.

Dated:  August 11, 2025                                s/ Eric C. Tostrud
                                                                          Eric C. Tostrud
                                                                          United States District Court